IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

LINDSEY JO B.,[1] )
)
Plaintiff, )
)
vs. ) Civil No. 20-cv-069-MAB
)
COMMISSIONER of SOCIAL SECURITY, )
)
Defendant. )

**MEMORANDUM and ORDER**

**BEATTY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) Benefits pursuant to 42 U.S.C. § 423.[2]

**Procedural History**

Plaintiff applied for DIB and SSI in April 2018, alleging a disability onset date of March 2, 2018. After holding an evidentiary hearing, an ALJ denied the application in September 2019. (Tr. 20-32). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final agency decision subject to judicial review. Plaintiff exhausted administrative remedies and filed a timely complaint with this Court.

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c) (*See* Doc. 11).

**Issues Raised by Plaintiff**

Plaintiff raises the following issues:

1. The ALJ's RFC determination was unsupported by substantial evidence as he improperly weighed the opinion of Plaintiff's treating provider, ANP Holdren; instead subjugating her opinion to stale, non-examining state agency determinations.

2. The ALJ failed to consider Plaintiff's spine impairments, in spite of supporting medical findings, at any point in his analysis.

**Applicable Legal Standards**

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[3] Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, *et seq*., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, *et seq*., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The claimant bears the burden of proof at steps 1–4. Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Accordingly, this Court is not tasked with determining whether or not Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does *not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

**<u>The Decision of the ALJ</u>**

The ALJ followed the five-step analytical framework described above. He

determined that Plaintiff had worked part-time, but not at the level of substantial gainful activity since the alleged onset date. She was insured for DIB through June 30, 2022. She was born in 1986 and was 32 years old on the alleged date of disability. The ALJ found that Plaintiff had severe impairments of major depressive disorder, bipolar disorder, anxiety disorder, polysubstance dependence (including marijuana and methamphetamine), personality disorder (NOS), and borderline personality disorder.

The ALJ found that Plaintiff had the RFC to do the full range of work at all exertional levels, with the following mental limitations:

> she can understand and remember simple instructions and carry out simple, routine, and rote tasks that require little independent judgment or decision-making. She must work in a stable work setting where there is little change in terms of tools used, the processes employed, or the setting itself, and change, when necessary, is introduced gradually. She should not have any public interaction as part of the job related duties.

Based on the testimony of a vocational expert ("VE"), the ALJ found that Plaintiff could not do her past relevant work as a cashier clerk or certified nurse's assistant. However, she was not disabled because was able to do other jobs that exist in significant numbers in the national economy.

**<u>The Evidentiary Record</u>**

The Court has reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. The following summary of the record is directed to the points raised by Plaintiff.

**1. Agency Forms**

Through counsel, Plaintiff filed a Disability Report in May 2018 stating she was disabled due to depression and bipolar disorder. (Tr. 250). She filed another report in

December 2018 stating that her condition had changed in that she was having memory difficulties. The form asked whether she had any new physical or mental conditions. She identified only memory problems. (Tr. 324).

**2. Evidentiary Hearing**

Plaintiff was represented by an attorney at the hearing in August 2019. (Tr. 42).

Plaintiff lived in a house with her husband and three children, ages three, six, and eight. The youngest was in pre-school for half of the day. Plaintiff's mother-in-law lived next door. In the afternoons, Plaintiff and the youngest child went to her mother-in-law's house. Plaintiff helped her with some cleaning. Plaintiff did general housework and some yardwork at her own house also. (Tr. 51-56).

Plaintiff's counsel stated that the reason they were there was "focusing on mental health issues." She questioned Plaintiff about her depression, anxiety, and bipolar disorder. Plaintiff testified that depression made her tearful and she did not feel like doing anything. She often felt anxious and overwhelmed in the afternoons. Bipolar disease caused her to "freak out." (58-61).

Plaintiff's counsel did not ask any questions about physical complaints. Counsel asked Plaintiff whether there was "[a]nything else other than the mental health issues that we have discussed that you believe either interfere[s] or prevent[s] your ability to work?" Plaintiff answered, "No." (Tr. 63).

**3. Relevant Medical Records**

Plaintiff was admitted to the hospital after a suicide attempt in August 2017, about six months before the alleged date of disability. She had been having suicidal

thoughts and tried to cut her wrist after a fight with her husband. She had a history of psychiatric illness but was not seeing a psychiatrist or taking any medications. She tested positive for amphetamines and methamphetamine. She was treated with medications and discharged five days later in improved condition. (Tr. 358-363).

Plaintiff was seen by NP McCullough in the outpatient clinic at Lawrence County Memorial Hospital on August 24, 2017 for follow-up. She said she did not remember cutting her wrist but did remember drinking a fifth of vodka and taking one Clonazepam pill. She had also been doing methamphetamine. She reported that her psychiatric symptoms were well controlled now on medications. Psychiatric exam was normal. (Tr. 456-459).

Plaintiff received mental health services through the Lawrence County Behavioral Health Department. She was evaluated on September 11, 2017. She said that she and her husband had been using methamphetamine regularly up to the date of her hospitalization, and that DCFS was going to be involved. Her husband was in jail and her children had been placed with her mother-in-law. She was diagnosed with Bipolar I and borderline personality disorder. Individual therapy and a psychiatric assessment were recommended. (Tr. 372-400).

In January 2018, Plaintiff told NP McCullough that she was feeling overwhelmed and stressed. She was working at Dollar General store and taking care of her three children on her own as her husband was in a rehab program. NP McCullough increased the dosage of Buspar, and Plaintiff was to continue taking Lamictal. (Tr. 490-492).

Plaintiff saw NP McCullough in mid-March 2018, shortly after the alleged date of

disability, for an upset stomach, and swelling and aching in her legs. Psychiatric exam was normal. (Tr. 504-507).

Psychiatric exam was normal at two more visits in March and April 2018. (Tr. 510, 515). NP McCullough saw Plaintiff five more times in April and May for various physical complaints. She noted no psychiatric complaints and did not do psychiatric exams at these visits. (Tr. 517-539).

Plaintiff was seen by NP McCullough in July 2018. She wanted to have disability paperwork completed. On psychiatric exam, she was alert and oriented; memory was intact; affect was normal; insight and judgment were normal; and she had no suicidal ideation or delusions. The NP recommended that the paperwork be completed by Plaintiff's counselor or psychiatrist. (Tr. 729-732).

Linda Collingsworth, Ph.D., performed a consultative psychological exam in August 2018. Plaintiff told her that DCFS took her children because her husband's marijuana had been found in their house. She said she cut her wrists after this and was hospitalized. Her children were gone for about two months. She had been clean of street drugs for over a year. Plaintiff's chief complaint was that she became agitated and irritable when she had to be around a group of people. She said her mood was good until people irritated her. She enjoyed playing Frisbee, going to the park, and being outside. She sometimes felt worthless but reported no suicidal ideation. Dr. Collingsworth first noted that her symptoms did not rise to the level of a DSM-V diagnosis. However, based on Plaintiff's report that her first husband had held her captive for a week and she still had nightmares about it, Dr. Collingsworth assigned a diagnosis of PTSD. (Tr. 621-624).

Plaintiff was assessed again at Lawrence County Health Department in September 2018. A social worker/mental health care provider noted that the County had been unable to hire a psychiatrist, so Plaintiff's primary care provider was prescribing her psychiatric medications. She was doing well and was "using appropriate skills of time outs and relaxation to make behavior changes." Plaintiff had received substance abuse treatment at Mulberry Center after her recent hospitalization and was completing substance abuse treatment with Southeastern Illinois Counseling Center.[4] The medications she was taking were effective. Her memory was not problematic. (Tr. 627-644).

Plaintiff was seen by a nurse practitioner at Lawrence County Health Department to follow-up on bipolar disorder in November 2018. She was taking Buspar and Lamictal and was not having significant affective symptoms. She was working part-time at McDonald's. Psychiatric exam was normal. The next month, she complained of mania and irritation. Exam was normal except for an anxious demeanor. In January 2019, Plaintiff said she had stopped taking Lamictal because of her belief that she had an adverse reaction. She was experiencing anxiety and decreased appetite. She said she felt calmer when she smoked marijuana. Exam was normal except for an anxious demeanor. She was prescribed Zoloft. (Tr. 648-659).

Plaintiff was seen in the outpatient clinic at Lawrence County Memorial Hospital in February 2019. Zoloft had made her symptoms worse and she had been lashing out at family members. Psychiatric exam was normal except for pressured speech and

[4] The administrative record does not contain records of substance abuse treatment.

irritability. She was prescribed Zyprexa and was to continue taking Buspirone as before. (Tr. 680-683). In March 2019, she reported that Zyprexa was not working, and she had six "freakouts" in the last four days. She was screaming and yelling but denied throwing anything, hitting, or suicidal thoughts. She said she had no history of substance abuse. Exam was normal except for racing thoughts. She was to start taking 1.5 mg. of Vraylar three times a day and increase the dosage to 3 mg. Two weeks later, she reported that the increased dose caused her to grind her teeth and it was making her moodier. Psychiatric exam was normal; she was alert and oriented, memory was intact, and affect was normal. She was to stop Vraylar and to start Abilify. (Tr. 664-672).

The police took plaintiff to Lawrence County Memorial Hospital in June 2019. She had resumed using methamphetamine four days earlier and had suicidal ideation. The psychiatric hospital would not admit her because she had been suicidal while under the influence but was no longer suicidal now that she was sober. She was discharged to home the same day in stable and improved condition. She was to follow up with Mental Health for outpatient therapy. (Tr. 753-756).

4. **State Agency Consultants' Opinions**

In August 2018 and November 2018, two state agency consultants assessed Plaintiff's mental RFC based on a review of the record. Both considered Dr. Collingsworth's examination as well as the other records obtained as of the time of their review. Both concluded that Plaintiff would be able to meet the basic mental demands of work involving simple one-to-two step instructions on a sustained basis in a setting of low social contact and with no interactions with the public. (Tr. 85-87, 113-116).

**5. APN Holdren's Opinion**

In June 2019, APN Jeanne Holdren completed a checkbox form assessing Plaintiff's mental RFC. She indicated that Plaintiff had a number of extreme limitations, including ability to recognize and correct a mistake, to ignore or avoid distractions, handle conflict with others, and respond to criticism. She had marked limitations in ability to work a full day without needing more than usual rest periods, ability to adapt to changes, and ability to respond to social cues. The form asked her to identify medical/clinical findings that support her assessment; she identified Plaintiff's diagnoses of bipolar disorder and borderline personality disorder.

**Analysis**

The Court does not find Plaintiff's second point compelling or worth a significant amount of discussion. Plaintiff was represented by counsel at the agency level. She is therefore presumed to have presented her best case for benefits. *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007). She did not argue at the agency level that her physical condition contributed to her inability to work. At the hearing, her attorney questioned her only about her mental impairments. When Plaintiff was asked whether there was "[a]nything else other than the mental health issues that we have discussed that you believe either interfere[s] or prevent[s] your ability to work?" Plaintiff answered, "No." (Tr. 63). She cannot now fault the ALJ for taking her at her word.

Plaintiff's first point concerns the weight assigned to NP Holdren's opinion. The agency revised the regulations regarding consideration of medical opinions in early

2017.[5] The revised regulations apply to applications filed on or after March 27, 2017 and are applicable here.

The revised regulations change the definition of "acceptable medical sources" who can provide objective medical evidence to establish the existence of a medically determinable impairment. The new definition includes nurse practitioners. 20 C.F.R. § 404.1502(a)(8).

The revised regulations redefine how evidence is categorized. The regulations specify five categories of evidence: (1) objective medical evidence, (2) medical opinion, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings. Evidence from a state agency consultant's' review, such as his or her RFC assessment, is now referred to as a prior administrative finding. 20 C.F.R. § 404.1513(a).

The new regulation on consideration of medical opinions substantially changes the old procedures. First, the definition of medical opinion is changed:

> A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities: . . .
>
> (i) Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);
>
> (ii) Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;

[5] 82 Fed. Reg. 5844 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15,132 (Mar. 27, 2017)).

(iii) Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and

(iv) Your ability to adapt to environmental conditions, such as temperature extremes or fumes.

20 C.F.R. § 404.1513(a)(2).

The new regulation does away with the old "treating source rule" that required a treater's medical opinion to be given controlling weight in some circumstances. The new regulation also does away with the requirement that the ALJ give "good reasons" for the weight given to a treater's opinion. Rather, all medical opinions are now weighed using the same considerations: (1) supportability; (2) consistency; (3) relationship with the claimant, which includes (i) length of the treatment relationship, (ii) frequency of examinations, (iii) purpose of the treatment relationship, (iv) extent of the treatment relationship, and (v) examining relationship; (4) specialization; and (5) other factors as appropriate. 20 C.F.R. § 404.1520c(c). The first two factors, supportability and consistency, are the most important. The ALJ is required to articulate how the factors of supportability and consistency were considered, but not necessarily the rest of the factors. 20 C.F.R. § 404.1520c(b)(2).

Here, the ALJ applied the correct version of the regulations. (Tr. 26). He found that NP Holdren's opinion was not persuasive because it was not supported by either the objective or subjective evidence. He cited Plaintiff's generally normal mental status exams and her daily activities. (Tr. 30).

NP Holdren was apparently on the staff at the Lawrence County Health Department, but none of the treatment notes are signed by her. The record does not

explain why she completed the form rather than one of the staff members who treated Plaintiff, and there is no information about what records she reviewed in order to make her assessment.

Plaintiff takes issue with the ALJ's characterization of her mental status exams as generally normal. She first suggests that lack of objective findings cannot be relied upon in a mental illness case. The cases she cites do not support that proposition. If Plaintiff's argument were correct, mental illness would always be *per se* disabling, which is simply not the case.

Plaintiff points to occasions when her mental status exams were not normal, starting with her 2017 hospitalization and the September 2017 assessment at Lawrence County Health Department. However, that was months before the alleged date of disability, and her suicide attempt occurred when she was using methamphetamine. She claims she was found to be a suicide risk on a later exam, citing Tr. 630. However, that record does not classify her as a suicide risk; it rates her at "1" for suicide risk, which means "watchful waiting, monitoring or preventative action." (Tr. 628). Se also points out that she was noted to be anxious on several visits and had a few other isolated findings on other exams. However, the ALJ acknowledged that there were findings of anxiety on some exams and he did not say that all of her exams were completely normal. Plaintiff highlights her two "suicide attempts" but the ALJ reasonably attributed these episodes to her use of methamphetamine. Indeed, psychiatric admission was denied in the second episode because Plaintiff was no longer suicidal after she sobered up. Plaintiff has not demonstrated that the ALJ mischaracterized the medical records.

Plaintiff criticizes the ALJ's reliance on her daily activities, arguing that it is error to equate the ability to engage in sporadic daily activities with the ability to work full-time. The ALJ did not equate the two. Rather, he reasonably concluded that Plaintiff's ability to care for her three young children, drive, shop, do housework and yardwork, tend to her own personal care, and engage in recreational activities was inconsistent with NP Holdren's opinion that she had marked and extreme limitations in several areas of mental functioning. (Tr. 30).

Lastly, Plaintiff argues that the ALJ erred in finding that the state agency consultants' administrative findings were more persuasive than NP Holdren's opinion because the state agency consultants did not review the entire file. That argument fails because plaintiff points to no medical evidence establishing that the later evidence is significant enough that it would have changed the consultants' opinions. *See Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018); *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018). She highlights her June 2019 trip to the hospital, but, again, the ALJ reasonably concluded that her "periods of decompensation" occurred when she was under the influence of drugs. (Tr. 29). It is true, as Plaintiff points out, that she had some symptoms which required medication adjustments in early 2019. However, she was started on Abilify on March 25, 2019 (Tr. 667) and the records reflect no further problems until she was taken by the police to the hospital in June after she had been using methamphetamine for four days. Plaintiff offers no reason to believe that this later evidence would cause the state agency consultants to change their opinions.

Plaintiff's arguments are little more than an invitation for this Court to reweigh

the evidence. She has not identified any error requiring remand. Even if reasonable minds could differ as to whether Plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot substitute its judgment for that of the ALJ in reviewing for substantial evidence. *Burmester,* 920 F.3d at 510; *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

**Conclusion**

After careful review of the record as a whole, the Court concludes that the ALJ committed no errors of law, and that his findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Plaintiff's application for disability benefits is **AFFIRMED**.

The Clerk of Court is directed to enter judgment in favor of Defendant.

**IT IS SO ORDERED.**

**DATE: October 15, 2020**

**s/ Mark A. Beatty**
**MARK A. BEATTY**
**United States Magistrate Judge**